**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

|  |  |
|---|---|
| Light Sources, Inc., | ) |
|  | ) |
|  | ) |
| Plaintiff, | ) Civil Action No. 3:02-cv-190 (SRU) |
|  | ) |
| v. | ) |
|  | ) |
| First Light Technologies, Inc., | ) |
|  | ) November 20, 2003 |
| Defendant. | ) |
|  | ) |

FIRST LIGHT TECHNOLOGIES' OPPOSITION TO LIGHT SOURCES' MOTION TO
ENFORCE SETTLEMENT AGREEMENT

John C. Linderman (ct 04291)
Wm. Tucker Griffith (ct 19984)
McCormick, Paulding & Huber LLP
CityPlace II, 185 Asylum Street
Hartford, CT 06103-4102
tucker@ip-lawyers.com
Tel.: 860-549-5290
Fax: 860-527-0464

Kenneth F. Dusyn (ct 21859)
330 Main Street, 3rd Floor
Hartford, CT 06106
kdusyn@aol.com
Tel.: 860-246-4600
Fax: 860-722-9570

Attorneys for Defendant

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................ iii

I.      INTRODUCTION ............................................................................................ 1

II.     FLT'S STATEMENT OF FACTS ESTABLISHING THAT NO SETTLEMENT
        AGREEMENT EXISTS BETWEEN THE PARTIES TO THIS ACTION ...................... 2

        A.    *The Background of the Litigation and the Origination of Settlement Discussions* ....... 2

        B.    *The Initial Offers by the Parties to Settle the Litigation* ............................................... 4

        C.    *The Negotiations Amongst the Parties Themselves* ....................................................... 5

        D.    *The July 1, 2003 Settlement Conference* ..................................................................... 7

        E.    *The Events Leading up to Plaintiff's Claim of an "Enforceable" Settlement
              Agreement* ................................................................................................................. 10

        F.    *The Draft Agreements* .............................................................................................. 13

        G.    *The October 8, 2003 Settlement Conference* ............................................................. 16

III.    ARGUMENT ................................................................................................. 17

        A.    *Relevant Applicable Law* ......................................................................................... 18

        B.    *FLT's So-Called "Offer" and LSI's So-Called "Acceptance" Do Not Constitute an
              Enforceable Agreement* ............................................................................................ 19

              1.    LSI's "Acceptance" Was Actually a Counter-Offer because LSI Altered the
                    Terms of FLT's So-Called "Offer" .......................................................................... 20

              2.    LSI's Purported Agreement Was Not the Result of a "Meeting of the Minds"
                    between the Parties .......................................................................................... 22

              3.    Several Issues on the Table Prior to FLT's So-Called "Offer" Were Ignored by
                    LSI's Alleged "Acceptance", and, Therefore, No Enforceable Agreement Was
                    Reached on All of the Material Issues for Settlement .......................................... 25

              4.    FLT's Proposed ADR Provision Was Only "New" after LSI Refused to Provide a
                    License under the Solymar Patent; The Reasons for the ADR Provision Existed
                    Well Prior to FLT's So-Called "Offer" .................................................................. 29

C.    *LSI's Failure to Address Any of FLT's Negotiating Points, Combined with LSI's Misplaced Reliance on a Settlement Agreement to Which FLT Has Not Agreed, Indicate that LSI Has Not Negotiated in Good Faith*..................................................31

IV.   OTHER BOGUS ISSUES RAISED IN LSI'S MEMORANDUM ..................................32

A.    *The Fact that No ADR Provision Was Requested in **This** Case Is Irrelevant*............32

B.    *LSI's Discussion of the Solymar Patent Litigation Is Misleading*..............................33

C.    *Any Payment by FLT to LSI Would Constitute a Hardship, Regardless of Amount*...33

D.    *The Alternative Settlement Offers Proposed by FLT Were Made in Accordance with the Magistrate's Suggestion*........................................................................................34

V.    CONCLUSION ..............................................................................................34

## TABLE OF AUTHORITIES

**Cases**

Brock v. Scheuner Corp., 841 F.2d 151 (6th Cir. 1988) ................................................................ 19

Callie v. Near, 829 F.2d 888 (9th Cir. 1987).................................................................................. 24

Core-Vent Corp. v. Implant Innovations, Inc., 53 F.3d 1252 (Fed. Cir. 1995)............................ 24

Enterprise Rent-A-Car Co. v. Rent-A-Wreck of Am., Inc., 181 F.3d 906 (8th Cir. 1999)........... 21

Finley v. Aetna Life & Cas. Co., 202 Conn. 190, 520 A.2d 208 (1987) ...................................... 19

HLO Land Ownership Assoc. Ltd. P'ship v. Hartford, 248 Conn. 350, 727 A.2d 1260 (1999) .. 18

In re Air Crash Disaster at John F. Kennedy Int'l Airport, 687 F.2d 626 (2d Cir. 1982)....... 19, 27

Kukla v. National Distillers Prods. Co., 483 F.2d 619 (6th Cir. 1973)........................................ 18

L & R Realty v. Connecticut Nat'l Bank, 53 Conn. App. 524, 732 A.2d 181 (1999) ...... 18, 25, 28

Local Motion, Inc. v. Niescher, 105 F.3d 1278 (9th Cir. 1997).................................................... 23

Millgard Corp. v. White Oak Corp., 224 F. Supp. 2d 425 (D. Conn. 2002)......... 18, 19, 21, 23, 26

Ozyagcilar v. Davis, 701 F.2d 306 (4th Cir. 1983) ........................................................... 19, 22, 24

S & T Mfg. Co. v. County of Hillsborough, 815 F.2d 676 (Fed. Cir. 1987) ................................ 24

United Paperworkers Int'l Union v. Champion Int'l Corp., 908 F.2d 1252 (5th Cir. 1990)......... 22

United States v. Orr Constr. Co., 560 F.2d 765 (7th Cir. 1977)........................................ 19, 21, 27

Wang Labs., Inc. v. Applied Computer Sci., Inc., 958 F.2d 355 (Fed. Cir. 1992) ..... 18, 19, 22, 25

**Statutes**

35 U.S.C. § 154(a)(2)..................................................................................................................... 28

I.    <u>INTRODUCTION</u>

On January 31, 2002, Plaintiff Light Sources, Inc. ("LSI") filed a patent infringement lawsuit against Defendant First Light Technologies, Inc. ("FLT").  In the past year, efforts have been made by the parties to settle the present dispute.  Unfortunately, negotiations have recently been replaced by a dispute over whether an actual agreement had been reached.  LSI now seeks to enforce a settlement agreement that was never agreed to by FLT inasmuch as several material aspects of any such settlement, in FLT's mind, were never addressed by LSI. [1]  Moreover, the purported agreement was **not** the result of LSI accepting an offer by FLT; FLT offered **no** settlement proposal in the form LSI now seeks to enforce.  Accordingly, FLT opposes LSI's Motion.

FLT considers LSI's Motion to be another ploy on the part of LSI to continue the harassment of FLT initiated with the filing of this lawsuit.  LSI's Memorandum fails to address several critical facts from the settlement negotiations between the parties that clearly show that no enforceable agreement was reached between the parties, and further that the issues remaining in dispute were clearly made known to LSI before and during the time period when LSI now states that an agreement was reached.  LSI has continually attempted to delay substantive action in this case, including obstructing FLT's attempts at discovery and to identify LSI's contentions in proving its case.  Due to LSI's delaying tactics, LSI's omission of critical facts and events from its recollection of the settlement discussions, and further due to the general frivolity of LSI's Motion, FLT hereby requests that it be awarded its reasonable attorneys' fees and costs incurred in responding to LSI's Motion.

---

[1]   During teleconferences on November 8 and 14, 2003, the Judge indicated that he was likely to deny LSI's Motion to Stay Discovery.  Accordingly, FLT does not address that aspect of LSI's Motion in its Response.

II.     FLT'S STATEMENT OF FACTS ESTABLISHING THAT NO SETTLEMENT
        AGREEMENT EXISTS BETWEEN THE PARTIES TO THIS ACTION

LSI's chronology of facts with respect to the settlement discussions between the parties is

incomplete and misleading.  (See LSI's Memo., pp. 1-16).  The following presentation of facts

has been necessitated by the numerous omissions and misrepresentations of facts in LSI's

Motion.  FLT's recounting is not intended to be a reconstruction of all the relevant facts.  Some

undisputed facts from LSI's chronology are not addressed in the following presentation of facts

by FLT.  The intent of the following presentation is to fill in the gaps left by LSI.  Comments are

provided in some of FLT's factual paragraphs to identify aspects that were incomplete, incorrect

or misleading in LSI's chronology.

FLT also submits herewith a Declaration from Kenneth F. Dusyn, co-counsel for FLT,

attached hereto as Defendant's Exhibit 20,[2] recounting events in the settlement negotiations that

are not clear from the written correspondence between counsel.  Unfortunately, several facts

omitted in LSI's chronology relate to oral conversations between the parties and their respective

counsel.  LSI has opted to ignore the occurrence, and certainly the substance of these

conversations, especially where detrimental to LSI's current Motion, because the effect these

conversations have on LSI's Motion is clear.

A.     *The Background of the Litigation and the Origination of Settlement Discussions*

1.     This lawsuit was brought by LSI against FLT on January 31, 2002 alleging willful

infringement of U.S. Patent 4,700,101 (hereinafter "the '101 Patent").  LSI's counsel at that time

was Peter Costas of the law firm Pepe & Hazard.  (See Docket No. [1]).

---

[2]   All Exhibits attached to LSI's Motion shall be referred to herein as Plaintiff's Exhibit (e.g., *Pl.s Ex. 8*).  Exhibits
attached to this Opposition Brief shall be referred to as Defendant's Exhibit (e.g., *Def.'s Ex. 20*), and, to avoid
confusion between the respective sets of Exhibits, shall continue sequentially with Plaintiff's Exhibits.

2.      On February 27, 2002, FLT filed its Answer to LSI's Complaint.  (See Docket No. [6]).  FLT's Answer denied LSI's charges of patent infringement, and further presented Affirmative Defenses and Counterclaims directed, *inter alia*, to non-infringement, invalidity, unenforceability, laches and estoppel.

3.      On March 26, 2002, a conference was had between counsel for the parties, and shortly thereafter, on March 28, 2002, a Report of Parties Planning Meeting was filed with the Court.  (See Docket No. [11]).  In this Report, the parties did not request an early Settlement Conference, but did express a preference for a Settlement Conference with a Magistrate Judge, if any such Settlement Conference were to be held.

4.      On June 18, 2002, Atty. Costas filed a Motion with the Court to withdraw as the attorney of record for LSI (see Docket Nos. [12], [13]), and on June 28, 2002, Attys. Arthur T. Fattibene and Paul A. Fattibene filed appearances with the Court as replacement counsel for LSI. (See Docket Nos. [14], [15]).

5.      The parties entered into a stipulated request for extension of time to complete discovery and filed a corresponding Revision of the Report of Parties' Planning Meeting on December 13, 2002, in which the parties expressed the desirability of attempting to settle the case before undertaking significant discovery and were willing to explore settlement at a Settlement Conference before a Magistrate Judge.  (See Docket No. [20]).

6.      Pursuant to a January 21, 2003 telephone Status Conference, the Court accepted the parties' Revised Planning Report and indicated that the matter of a settlement negotiation would be referred to a Magistrate Judge.  (See Docket No. [22]).  FLT also requested a written proposal(s) from LSI for the settlement of the case, to which FLT would make an appropriate response or counter-offer.

B.     *The Initial Offers by the Parties to Settle the Litigation*

7.     By letter of January 22, 2003, LSI made multiple offers of settlement to FLT:

(i) LSI would accept a one-time lump sum payment of $600,000 for a fully paid-up license based on LSI's estimate of FLT's gross sales for the years 1996 to 2005, **or** a 5% royalty of FLT's gross sales running from January 1, 1996 to the expiration date of the '101 patent, i.e., February 7, 2005.

(ii) Alternatively, FLT would pay LSI a lump sum payment of $400,000 for past infringement of the '101 patent dating back to 1996, with a promise to immediately cease the manufacture and sale of "the accused lamp" during the remaining life of the '101 patent.

(See *Pl.'s Ex. 3*).  What is **<u>omitted</u>** from LSI's chronology (see LSI's Memo., ¶ 5), is that the settlement amount based on LSI's offer would be adjusted upwardly or downwardly to conform with FLT's <u>actual</u> sales.  Due to the Protective Order (see Docket No. [19]), LSI's offers were based on LSI's best estimate of FLT's sales of the "accused lamp".  (See *Pl.'s Ex. 3, p. 1, ¶ 3*).

8.     On January 23, 2003, the Court referred this case to Magistrate Judge Garfinkel for a Settlement Conference.  (See Docket No. [22]).  Magistrate Judge Garfinkel scheduled a Settlement Conference for April 3, 2003.  (See Docket No. [23]).

9.     By letter of February 5, 2003 (*Pl.'s Ex. 4*), FLT rejected LSI's offers and proposed a counteroffer of $10,000, believing that "the facts surrounding the issues in the litigation weigh heavily in FLT's favor and that the litigation was initiated out of personal disputes and differences between the principals of LSI and FLT."  (*Pl.'s Ex. 4, p. 2, ¶ 1*).

10.     By letter of February 12, 2003 (*Pl.'s Ex. 5*), LSI responded to FLT's $10,000 counter offer as being "deminimis" [sic] and "not serious or realistic." As a result, LSI purportedly countered with a new offer:

LSI will modify the offer by reducing the paid up lump sum license payment from $600,000.00 to $500,000.00 and the lump sum payment for past infringement only from $400,000.00 to $350,000.00 based on FLT's estimated sales, <u>to be pro rated upward or downward in accordance to FLT's actual sales.</u>

(See *Pl.'s Ex. 5* (emphasis added)).  The underlined portion of the above-quote was **omitted** from LSI's chronology of the facts (see LSI's Memo., ¶ 7).  Though identified as a "modified" offer, it is clear that the caveat to pro rate the settlement amount based on <u>actual</u> sales merely made the offer the same exact offer as LSI's first offer in its January 22, 2003 letter (*Pl.'s Ex. 3*).  The only modification was to the estimated numbers, which, according to LSI's caveat, would not form the final settlement amount.

11.    By letter of March 13, 2003 (*Pl.'s Ex. 6*), FLT rejected LSI's February 12, 2003 offer and counter-offered once again.  Specifically, FLT stated that it "will increase its offer to a flat fee of $25,000 for LSI's withdrawal of the lawsuit and the negotiation of a fully paid-up license to FLT for the remaining term of the patent."  (*Pl.'s Ex. 6, p. 2, ¶ 1*).

12.    By letter of March 31, 2003, LSI requested what the specific terms would be for a "paid up license for the balance of the patent term." (*See Def.'s Ex. 21*).  This letter was not made an Exhibit for LSI's recounting of the facts.

13.    By letter of March 31, 2003 (*Pl.'s Ex. 7*), FLT clarified the "paid up license" language of its March 13, 2003 letter as follows:

> Insofar as FLT's offer of settlement is concerned, the amount of $25,000 was <u>not</u> offered for past infringement.  It was offered for a withdrawal of the lawsuit and a fully negotiated paid up license for the remainder of the term of the patent.  The placement of the word "negotiated" was inadvertent and not intended to include future negotiations as part of the settlement counteroffer.

(See *Pl.'s Ex. 7, p. 1, ¶ 3*).

C.    *The Negotiations Amongst the Parties Themselves*

14.    On April 1, 2003, Atty. Dusyn telephoned Atty. Arthur Fattibene and Magistrate Judge Garfinkel's chambers to inform them that Mr. Sauska and Mr. Ell, both presidents of their respective companies LSI and FLT, were in direct negotiations with each other in an attempt to

settle the litigation amongst themselves. LSI confirmed this conversation by letter dated April 1, 2003. (See *Def.'s Ex. 22*). Authorization was given by Magistrate Judge Garfinkel to continue the scheduled April 3, 2003 Settlement Conference to a date after May 6, 2003. Counsel were instructed to report to Magistrate Judge Garfinkel on April 15, 2003 to advise him of the status of the parties' negotiations. (See *Def.'s Ex. 23* (FLT's April 2, 2003 letter to Magistrate Judge Garfinkel)). These letters were not provided with LSI's recounting of the facts. Further, the discussions between the principals were not discussed in LSI's recounting of the facts. (See also *Def.'s Ex. 24* (LSI's April 7, 2003 confirmation that the principals were discussing settlement)).

15.     By letter of April 15, 2003, Atty. Dusyn reported to Magistrate Judge Garfinkel that delays in negotiations were encountered between Messrs. Sauska and Ell, and that additional time was needed to allow the parties to exchange communications. (See *Def.'s Ex. 25*).

16.     In a May 1, 2003 telephone conference, Attys. Dusyn and Fattibene discussed the status of the negotiations between the parties. On the same day, Mr. Ell traveled to LSI in Orange, Connecticut to personally meet with Mr. Sauska in an attempt to settle the litigation. The result of that meeting was a positive one in that LSI and FLT reached a preliminary oral agreement, in principle, to settle the case for $150,000 payable by FLT to LSI <u>over a 5-year time frame</u>. This preliminary agreement, and the terms thereof, were **<u>omitted</u>** from LSI's recounting of the facts. This <u>crucial fact</u> of the payment of $150,000 <u>over a 5-year period</u> to settle the lawsuit was personally reported to Atty. Fattibene by Atty. Dusyn before the commencement of the settlement negotiations before Magistrate Judge Garfinkel on <u>July 1, 2003</u>. The terms of the preliminary agreement was also reaffirmed to Fattibene at the October 8, 2003 Settlement Conference in Magistrate Judge Garfinkel's chambers. (See Declaration of Kenneth F. Dusyn, *Def.'s Ex. 20, ¶¶ 12-13* (hereinafter "Dusyn Decl.")).

17.     On May 2, 2003, Atty. Dusyn contacted Magistrate Judge Garfinkel's office and left a voice-mail message to the effect that the parties were close to settlement, but that the numbers had to be communicated to and approved by another principal of FLT (Mark E. Kurtz), who was then traveling abroad.  (See Dusyn Decl., *Def.'s Ex. 20, ¶ 7*).

18.     Inasmuch as Mr. Kurtz could not be reached, the parties, through their counsel and with the approval of Magistrate Judge Garfinkel, agreed to the filing of a Stipulated Motion to Suspend Discovery which was filed by FLT on May 8, 2003.  (See Docket No. [26]).  In the event of a breakdown in negotiations, a Settlement Conference was scheduled before Magistrate Judge Garfinkel on July 1, 2003.  A copy of the Stipulated Motion was forwarded to Atty. Fattibene by Atty. Dusyn on May 8, 2003.  (See *Def.'s Ex. 26*).  The Stipulated Motion was approved and entered by the Court on May 16, 2003.  (See Docket No. [26-1]).

19.     As indicated in Paragraph 10 of LSI's chronology (see LSI's Memo., p. 7), a proposed sale of FLT to LSI became an issue during the negotiations between the parties.  The negotiations subsequently broke down when no agreement could be reached regarding the terms and conditions of the sale.  The breakdown in negotiations included the preliminary agreement, in principle, reached in May 2003.  Atty. Dusyn informed Atty. Fattibene of the breakdown in negotiations by way of a letter dated June 23, 2003.  (See *Def.'s Ex. 27*).  Due in part to the break down in negotiations, Atty. Dusyn further informed Atty. Fattibene in the same letter, that FLT was proceeding ahead with and would attend the scheduled July 1, 2003 Settlement Conference.

D.     *The July 1, 2003 Settlement Conference*

20.     The July 1, 2003 Settlement Conference was attended by Atty. Dusyn and Mr. Ell on behalf of FLT and Attys. Art and Paul Fattibene and Mr. Sauska on behalf of LSI.  (See Docket No. [27]).

21.     The partial characterization of the July 1, 2003 Settlement Conference in

Paragraph 11 of LSI's chronology of events states that:

> At the Settlement Conference, First Light indicated that an offer of $150,000 was made
> by Ken Ell directly to Christian Sauska. However, no confirmation of any such offer has
> been made.

(LSI's Memo., p. 7). LSI's presentation of the Settlement Conference **omits** crucial facts. As

confirmed by Atty. Dusyn's Declaration (*Def.'s Ex. 20*), Atty. Fattibene was personally informed

by Atty. Dusyn of the preliminary oral agreement reached between LSI and FLT – i.e., to settle

the lawsuit, <u>FLT would pay LSI $150,000 over a period of 5 years</u>. During settlement

negotiations, Atty. Fattibene expressed surprise in that he knew nothing of the preliminary

agreement. Atty. Dusyn, in turn, expressed surprise at Atty. Fattibene's lack of knowledge of his

client's activities. In fact, according to Atty. Dusyn's Declaration (see *Def.'s Ex. 20, ¶ 13*), the

fact of the preliminary agreement, as well as its terms, were communicated to Atty. Fattibene

<u>several</u> times that day, both personally and through Magistrate Judge Garfinkel as an

intermediary. The fact that LSI's Motion ignores the five-year time frame communicated to him

on July 1, 2003 renders LSI's characterization of the July 1, 2003 events as a **misrepresentation**

to the Court and also renders incomplete LSI's recounting of the relevant facts.

22.     During the course of the settlement negotiations on July 1, 2003, the <u>complete</u>

preliminary oral agreement was related to Magistrate Judge Garfinkel who, in turn,

communicated it to Attys. Art and Paul Fattibene and Mr. Sauska. Thereafter, it became clear

that Mr. Sauska never informed his own counsel of this <u>crucial fact</u> because Magistrate Judge

Garfinkel reported back to Atty. Dusyn and Mr. Ell that Mr. Sauska had no recollection of that

agreement. (See Dusyn Decl., *Def.'s Ex. 20, ¶ 12-14*). No agreement was reached at the July 1,

2003 Settlement Conference.

23.    As the result of a Status Conference before the Court on July 23, 2003, the parties agreed to resume discovery, which would be conducted simultaneous with continuing settlement negotiations.  (See Docket No. [29]).

24.    On August 4, 2003, a Joint Revised Planning Report extending the discovery deadlines was submitted to the Court.  (See Docket No. [28]).  The Joint Revised Planning Report was approved and entered by the Court's order of August 8, 2003.

25.    While the events reported in Paragraphs 12-15 of LSI's chronology (see LSI's Memo., pp. 7-8) are accurate, LSI's recounting of the facts **omits** the reason for FLT's raising its offer from $150,000 to $200,000 to settle the lawsuit at the July 1, 2003 Settlement Conference – i.e., FLT wished to be free from harassing lawsuits based on other patents owned by LSI, specifically, the Solymar patent (U.S. Patent No. 5,166,527).  (See *Pl.'s Exs. 8, 17*.)  During the personal negotiations between Messrs. Ell and Sauska, Mr. Sauska indicated that any multiple-step end cap incorporated in a lamp manufactured and/or sold by FLT would be interpreted by LSI as infringing the Solymar patent.  Therefore, regardless of the narrow language set forth in the October 2000 Settlement Agreement reached between FLT and LSI, LSI would still bring suit against FLT. (See *Pl.'s Ex. 18*).

26.    FLT's concerns about future harassing lawsuits and lawsuits filed by LSI against FLT without reasonable pre-filing investigation were communicated to Atty. Fattibene in a teleconference between counsel preceding the July 23, 2003 Status Conference.  During that conversation, Atty. Fattibene accused FLT of trying to "re-write" the prior October 2000 Settlement Agreement.  At that time, FLT's attorneys assured Atty. Fattibene that FLT was **not** attempting to rewrite the October 2000 Agreement and clarified that its concerns were with being sued for lamp designs not covered by the prior Agreement.

27.     FLT's concerns about future harassing lawsuits were also reiterated during the July 23, 2003 Status Conference before Judge Underhill.  In fact, Atty. Fattibene raised the issue of the prior Agreement and his belief that FLT was trying to "re-write" the agreement during the Status Conference.  Once again, FLT's attorneys tried to clarify that FLT had no intentions of altering the October 2000 Agreement.  FLT once again also clarified that it was concerned with future disputes between the parties that may arise with lamp designs <u>not</u> covered by the October 2000 Agreement. LSI's failure to even acknowledge these concerns provided some of the basis for FLT's desire to continue settlement negotiations with language addressing future disputes between the parties.

28.     FLT's concerns about future harassing lawsuits were also reiterated in FLT's letter to LSI dated August 2, 2003.  (See *Pl.'s Ex. 8*).  The fact that FLT had raised these concerns were acknowledged in LSI's letter dated August 18, 2003.  (See *Pl.'s Ex. 9*).

E.     *The Events Leading up to Plaintiff's Claim of an "Enforceable" Settlement Agreement*

29.     After the July 1, 2003 Settlement Conference did not result in a settlement, Magistrate Judge Garfinkel telephoned counsel, individually, in an effort to bring the parties closer to settlement.  Magistrate Judge Garfinkel was able to get the parties to provisionally agree to a settlement amount of $200,000.  However, both parties recognized that details of the settlement, beyond numbers, still needed agreement.

30.     By letter of September 5, 2003, FLT responded to LSI's August 18, 2003 letter. (See *Pl.'s Ex. 10*).  Atty. Dusyn stated that:

> [F]or the reasons stated in my letter to you of August 2, 2003, <u>FLT maintains its present position and conditions for settling the controversies between LSI and FLT</u>.  In short, FLT is willing to pay $200,000 over four years to settle all past and present claims surrounding the patent in this suit (the '101 patent), as well as receiving a fully paid up license for the remaining terms of both the '101 patent and the Solymar patent.  If LSI is not willing to grant to FLT a fully paid up license for the remaining enforceable term of the Solymar patent, then <u>FLT will honor the previous orally agreed upon amount of $150,000</u> to settle this lawsuit.

10

(*Pl.'s Ex. 10* (emphasis added)).  In light of the negotiations between the parties up to this point,

the offer recited as the "previous orally agreed upon amount of $150,000" was an obvious

reference to the preliminary oral agreement reached between Messrs. Sauska and Ell during Mr.

Ell's visit to LSI on May 1, 2003 which had been communicated to Atty. Fattibene.  (See Dusyn

Decl., *Def.'s Ex. 20, ¶¶ 6, 12A-14*).

   31. Upon receiving FLT's September 5, 2003 letter (*Pl.'s Ex. 10*), Atty. Fattibene

called Atty. Dusyn on September 8, 2003 to inquire whether FLT's offer of $150,000 was "over

time."  Atty. Dusyn replied "I believe it was over 4 or 5 years, but I would have to check with

Ken Ell."  (See Dusyn Decl., *Def.'s Ex. 20, ¶ 17*).  Atty. Dusyn informed Atty. Fattibene that

Ken Ell left for a trip to Asia on September 7, 2003 and was due to return on September 22,

2003.  (See also *Pl.'s Ex. 10A* (stating a response would be provided once Atty. Fattibene could

contact either Mr. Sauska or Mr. David V. Myers)).

   32. By letter of September 12, 2003, LSI responded by literally interpreting the

"previous orally agreed upon amount of $150,000" language of FLT's September 5, 2003 letter.

Specifically, LSI responded as follows:

> I am please to advise you that Light Sources, in an effort to amicably resolve this law suit
> without further delay, <u>has agreed to accept First Light's offer of $150,000 and to grant
> First Light a non-exclusive paid up license under the '101 patent in suit.  Obviously, the
> payment of the $150,000 would be a one-time payment and would be non-refundable</u>.

(*Pl.'s Ex. 11* (double underlined emphasis added)).  On page 2, LSI further responded:

> If First Light is not agreeable to making the full payment at the time of closing, then
> <u>Light Sources would be agreeable to accepting half at the time of closing and the other
> half on the first anniversary of the closing date</u>.

(*Pl.'s Ex. 11* (emphasis added)).  LSI's recounting of the facts pertaining to the so-called

acceptance is incomplete.  Specifically, the emphasized portions of the preceding Paragraphs

were **omitted**. Clearly, LSI's "acceptance" had a condition attached to it, *viz.*, that FLT accept LSI's mode of payment as opposed to the payment plan that had been reached in the preliminary oral agreement between Messrs. Ell and Sauska (i.e., over five years). LSI therefore presented an invitation to FLT in the form of a counteroffer for FLT to either accept or reject its condition.

33.     On September 15, 2003, Atty. Fattibene telephoned Atty. Dusyn, and while the event reported in LSI's Paragraph 18 is accurate, it **omits** that Atty. Dusyn indicated to Atty. Fattibene in the same telephone call that no response had been received from Mr. Ell commenting on LSI's counter-offer. At no time did Atty. Dusyn accept Atty. Fattibene's conditions attached to its "acceptance" or counter-offer, either orally or otherwise. Atty. Dusyn never received any instructions from Mr. Ell one way or the other owing to the latter's being out of the country.

34.     On September 23, 2003, Magistrate Judge Garfinkel's secretary telephoned Atty. Dusyn to inform him that another Settlement Conference between the parties was scheduled for October 8, 2003. A notice to that effect was sent to the parties on or about September 25, 2003. (See Docket No. [30]). It is FLT's understanding that LSI had requested that the Settlement Conference be used to place any agreement reached "on the record." (Cf. LSI's Memo., ¶ 28).

35.     By letter of September 26, 2003, FLT informed LSI that the $150,000 offer made in its September 5, 2003 letter was tied to the previous preliminary agreement reached between Mr. Ell and Mr. Sauska (on May 1, 2003), and that the $150,000 was to be paid over five years. (See *Pl.'s Ex. 12*). Portions of that letter are particularly relevant and bear repeating:

> As I indicated in my previous letter of September 5, 2003, FLT will honor the previous agreement reached between Ken Ell and Christian Sauska to settle the lawsuit for $150,000. <u>As part of that agreement, the payment of the $150,000 was to take place over a period of five years.</u> This was confirmed to you in our telephone conversation of September 15, 2003.

> In view of the above, FLT continues to stand by the above agreement.  <u>FLT further proposes that the five year payments be made in twenty equal installments on a quarterly basis, the first quarterly payment commencing with the signing of a settlement agreement effectively terminating this litigation on mutually agreeable terms and conditions.</u>  In order to initiate the settlement agreement process <u>and ferret out any outstanding issues that may exist between the parties</u>, FLT suggests and proposes the terms and conditions contained in the enclosed Settlement Agreement draft [*Pl.'s Ex. 12A*].  Please keep in mind that this draft is intended as a template, and if you have any other issues that you would like addressed in the Agreement, please propose them now so that we can consider them before we meet with Magistrate Judge Garfinkel.

(*Pl.'s Ex. 12* (emphasis added)).  Contrary to the **<u>misleading</u>** statement contained in Paragraph 21 of LSI's chronology, the five-year provision <u>was</u> discussed amongst the parties prior to FLT's September 5, 2003 letter.  In this regard, see Paragraphs 16, 21-22, *supra*, and Atty. Dusyn's Declaration (*Def.'s Ex. 20, ¶¶ 6, 12A-13*).  With regard to the payment of the $150,000 over a period of time, the only "new" provision presented was <u>how</u> the payments were to be made during those five years, and FLT proposed that they take place in equal quarterly payments.

36.     The purpose of FLT's September 26, 2003 Settlement Agreement Draft Proposal was "to initiate the settlement agreement process and <u>ferret out any outstanding issues</u>", not "to memorialize the settlement reached" as LSI **<u>misleadingly</u>** states in Paragraph 19 of its Motion. (See *Pl.'s Ex. 12*).

F.     *The Draft Agreements*

37.     As part of FLT's September 26, 2003 Draft Proposal, Paragraph 6 contained a provision for addressing future disputes between the parties which had been discussed by the parties well prior to LSI's alleged date of agreement.  Paragraph 6 also contained an ADR provision in the event that the parties would be unable to resolve any dispute:

> 6. The parties hereby agree to make reasonable efforts to resolve any future disputes with regard to <u>any intellectual property owned by LSI or FLT</u>, including but not limited to the written notification of any such dispute to the respective party.  The party receiving such written notice shall have a period of ten (10) business days within which to respond, in

writing, to the written notice of dispute.  Thereafter, the parties shall make a good faith effort to resolve the dispute.  In the event that the parties are unable to resolve the dispute between them, the parties shall submit the disputed matter to Alternative Dispute Resolution whereby an independent arbiter will resolve and decide the dispute.  Any decision rendered by the independent arbiter regarding the dispute shall be binding on both parties.

(*Pl.'s Ex. 12A* (Emphasis added)).  As stated in LSI's chronology, the ADR provision was not

discussed *per se* prior to September 12, 2003, but the reasons for including Paragraph 6

containing the ADR provision were discussed at the June 23, 2003 Status Conference and the

July 1, 2003 Settlement Conference.  In this regard, see Paragraphs 25-27, supra.

38.     Also contained in FLT's September 26, 2003 Draft Proposal for the first time in

writing were several clauses and conditions relating to issues that are critical for the execution, as

well as definition, of a Settlement Agreement.  These issues are: a recognition of the ownership

of the '101 Patent (¶ 1); the grant of a fully paid-up license (¶ 2); release of past claims that each

party may have against the other (¶ 3); withdrawal of the lawsuit (¶ 4); assigned costs for

attorneys fees (¶ 5); the term of the Settlement Agreement (¶ 7); and the jurisdictional laws

controlling a finalized and yet-to-be-reached settlement agreement (¶ 10).  Up to the time of

submission of this Draft, none of these issues were discussed or raised by either party during the

settlement negotiations.

39.     By letter of September 29, 2003, LSI countered with its own Settlement

Agreement Draft Proposal.  (See *Pl.'s Exs. 13, 13A*).  In essence, and with some minor revisions,

LSI's Draft contained two fundamental differences.  The first was that Paragraph 6 of FLT's

September 26 Draft Proposal was deleted in its entirety.  The second was that LSI provided a

draft agreement in the form of a Stipulated Dismissal with Prejudice for the withdrawal of the

lawsuit.  The remainder of the provisions included in FLT's new offer of settlement was

substantially agreed to.  (See LSI's Memo., ¶ 26).

40.     In LSI's letter accompanying its counter proposal for settlement, LSI maintained that the payment of the $150,000 settlement amount over five years was a "new issue" and was raised for the <u>first time</u> in FLT's September 26, 2003 letter.  (See *Pl.'s Ex. 13*; cf. Dusyn Decl., *Def.'s Ex. 20, ¶¶ 4-8, 12A-13*).

41.     By letter of October 2, 2003, FLT acknowledged LSI's September 29, 2003 letter and rejected LSI's September 29, 2003 Settlement Draft Proposal.  (See *Pl.'s Ex. 14, ¶ 4*).  FLT further stated that:

> It is obviously clear that all that has been agreed to up to the present date is the $150,000 <u>amount</u> of the settlement.  With the exception of LSI's proposed "payment plans," the <u>full</u> terms and conditions of a settlement agreement were never discussed which is why I submitted the September 26, 2003 Draft with my September 26, 2003 letter.  That proposal, which has now been revised corresponding to the enclosed October 2, 2003 Draft Proposal, contains FLT's terms and conditions under which it is willing to settle this litigation.

(*Pl.'s Ex. 14, ¶ 3*).

42.     In rejecting LSI's September 29, 2003 Draft Proposal, FLT submitted another Draft Proposal dated October 2, 2003, that accepted slight modifications suggested in LSI's Draft Proposal.  (See *Pl.'s Ex. 14*).  An additional change was made to FLT's Draft Proposal, inasmuch as FLT believed the parties were still negotiating critical issues for settlement:

> C. Paragraph 8 of our September 26, 2003 Draft is changed to: "The term of this Agreement shall remain in force until December 9, 2011."  The reason for this change is to accommodate the expiration date of the Solymar patent which is twenty (20) years from its December 9, 1991 filing date.  The intent of this provision is not an attempt to extend the terms of this agreement to obtain any license or concessions under the Solymar patent, <u>but is included here solely to provide a forum</u> for accommodating any future disputes that may arise between the parties.

(*Pl.'s Ex. 14, ¶ 8C*).

G.    *The October 8, 2003 Settlement Conference*

43.    On October 8, 2003, the scheduled Settlement Conference took place between Attys. Arthur and Paul Fattibene, counsel for LSI, Mr. Myers, vice-president of LSI, and Atty. Dusyn, counsel for FLT.  (See Docket No. [30]).  Magistrate Judge Garfinkel did not attend this conference due to a trial he was presiding over at the time.  As a result, the Settlement Conference was not made "of record" as LSI had requested.  No agreement between the parties was reached.  LSI, via Mr. Myers, offered a concession to have the $150,000 paid to LSI in three installments over two years, but without an ADR provision.  FLT, via Atty. Dusyn, responded that FLT desired an ADR provision in any settlement agreement reached between the parties for the reasons previously identified.  Mr. Myers said that was unacceptable.  As a result, the negotiations were terminated and Atty. Dusyn stated that FLT would continue the litigation.

44.    On October 9, 2003, Judge Garfinkel faxed a Memorandum to the parties, care of Attys. Fattibene and Dusyn.  (See *Def.'s Ex. 28*).  The Magistrate's Memorandum was **omitted** from LSI's recounting of the facts.  The Memorandum directed counsel to confer once again with their respective parties, and requested a telephonic Status Report from counsel by October 20, 2003.  Magistrate Judge Garfinkel also observed that "[o]ne thing is clear – there isn't an enforceable deal yet because important payment logistics have been up in the air." (*Def.'s Ex. 28*).

45.    On October 13, 2003, Atty. Fattibene wrote to Magistrate Judge Garfinkel ostensibly to "advise your Honor as to what occurred during the Settlement Conference meeting of October 8, 2003, in your Honor's chambers in your absence." (*Pl.'s Ex. 15*).  The **misleading** statements and biased account of the discussions by LSI are too numerous to comment on here.

46.    On October 15, 2003, after discussing Magistrate Judge Garfinkel's Memorandum with FLT, Atty. Dusyn submitted three alternative options to Magistrate Judge

Garfinkel for settling the lawsuit. (See *Def.'s Ex. 29*). Accompanying the presentation of the options was Atty. Dusyn's request that Magistrate Judge Garfinkel personally present FLT's options to Atty. Fattibene so as to avoid the abrasive tone of the negotiations that took place on October 8, 2003 during which LSI repeatedly insisted that an agreement was already in place.

47. By letter of October 22, 2003, Atty. Dusyn wrote to Magistrate Judge Garfinkel to summarize the offers exchanged between the parties and to comment on Atty. Fattibene's letter of October 13, 2003. (See *Pl.'s Ex. 16*). In addition, Atty. Dusyn again requested Magistrate Judge Garfinkel to submit FLT's alternative proposals to LSI. (See *Def.'s Ex. 28*). On the same, day Magistrate Judge Garfinkel telephoned Atty. Dusyn to advise that LSI had rejected all three of FLT's alternative options.

48. By letter of October 23, 2003, FLT indicated that while it "remains open to seeking a reasonable resolution of this matter, it will only do so in the future if negotiations are conducted with an intermediary present." (*Def.'s Ex. 30*).

49. On or about November 7, 2003, the parties received an order from the Court scheduling another Settlement Conference for December 4, 2003 before Magistrate Judge Garfinkel.

III.    <u>ARGUMENT</u>

It is clear from the complete chronology of facts that no agreement exists between the parties for the settlement of this lawsuit. Specifically, it is clear that FLT's so-called offer was never accepted by LSI. Instead, LSI made a counter-offer for settlement, the terms of which were never accepted by FLT. Moreover, it is clear that even though an agreement in principle was reached on the monetary amount to be paid by FLT to LSI in exchange for resolving this case, there was never a "meeting of the minds" as to all material issues defining the settlement.

A.       *Relevant Applicable Law*

This circuit has recognized that the district court has the power to enforce a settlement of

litigation pending before it, even if that agreement has not been reduced to writing.  See Millgard

Corp. v. White Oak Corp., 224 F. Supp. 2d 425, 432 (D. Conn. 2002).  However, courts have

cautioned that:

> The power of a trial court to enter a judgment enforcing a settlement agreement has its
> basis in the policy favoring the settlement of disputes and the avoidance of costly and
> time-consuming litigation. . . . While summary enforcement of a settlement agreement
> may very well promote the above policy in cases where there exists no substantial dispute
> as to the entry into, or the terms of, the agreement, summary proceedings may result in
> inequities when . . . such a dispute does exist.

Kukla v. National Distillers Prods. Co., 483 F.2d 619, 621 (6th Cir. 1973) (citations omitted); see

also Millgard, 224 F. Supp. 2d at 433 ("a court only has the authority to summarily enforce a

settlement agreement 'when the terms of the agreement are clear and unambiguous.'" (citations

omitted)).

A settlement agreement is a contract.  See HLO Land Ownership Assoc. Ltd. P'ship v.

Hartford, 248 Conn. 350, 356, 727 A.2d 1260 (1999) ("[I]t is a well established principle that . . .

a stipulation of the parties is to be regarded and construed as a contract.").  Connecticut law

recognizes that:

> To form a valid and binding contract in Connecticut, there must be a mutual
> understanding of the terms that are definite and certain between the parties. . . . If the
> minds of the parties have not truly met, no enforceable contract exists.

L & R Realty v. Connecticut Nat'l Bank, 53 Conn. App. 524, 534-35, 732 A.2d 181 (1999)

(quotations and citations omitted); see also Wang Labs., Inc. v. Applied Computer Sci., Inc., 958

F.2d 355, 359 (Fed. Cir. 1992) ("A district court does not have the power to impose a settlement

agreement when there was never a meeting of the minds.").  The determination of whether a

contract exists is a factual one.  See L & R Realty, 53 Conn. App. at 534.

A Court may only enforce an agreement as agreed to by the parties, and is not permitted to alter the terms of the agreement.  See In re Air Crash Disaster at John F. Kennedy Int'l Airport, 687 F.2d 626, 629 (2d Cir. 1982).  Thus, "[t]he proper role of the district court in enforcing settlement agreements . . . [is] 'to find, if he can, the terms of the complete settlement agreement, or to determine that there was none.'"  Ozyagcilar v. Davis, 701 F.2d 306, 308 (4th Cir. 1983) (the existence of a disputed terms called into question whether a settlement actually existed) (citation omitted) (emphasis in original); see also Brock v. Scheuner Corp., 841 F.2d 151, 154 (6th Cir. 1988) (emphasis added) ("Before enforcing settlement, the district court must conclude that agreement has been reached on all material terms.").

"[T]he intention of the parties manifested by their words and acts is essential to determine whether a contract was entered into and what its terms were."  Finley v. Aetna Life & Cas. Co., 202 Conn. 190, 199, 520 A.2d 208 (1987) (quotations omitted).  Where the parties consistently clash over the terms of an agreement, sufficient evidence exists that no agreement has been reached between the parties.  See Wang Labs., 958 F.2d at 359-60; United States v. Orr Constr. Co., 560 F.2d 765, 770 (7th Cir. 1977).

B.     *FLT's So-Called "Offer" and LSI's So-Called "Acceptance" Do Not Constitute an Enforceable Agreement*

LSI relies on written correspondence between counsel as evidence that an enforceable agreement was reached between the parties.  Specifically, LSI asserts that FLT made an offer in its September 5, 2003 letter, which offer was thereafter accepted by LSI.  (See LSI's Memo., p. 23; see also *Pl.'s Ex. 10*).  A complete review of the settlement discussions reveals that substantial disputes remain regarding the entry into and the terms of any supposed settlement agreement.  In fact, LSI cannot identify any evidence showing the terms of any complete agreement, to which FLT consented, when the agreement was allegedly entered into.  See Millgard, 224 F. Supp. 2d at

433 ("a court only has the authority to summarily enforce a settlement agreement 'when the terms

of the agreement are clear and unambiguous.'" (citations omitted))

LSI mostly relies on FLT's September 5, 2003 letter to support its arguments. (See *Pl.'s Ex. 10*). This letter expressly stated that if LSI was unwilling to go through with a fully paid-up license on the '101 patent and the Solymar patent, then the settlement proposal would return to the previous preliminary oral agreement between the parties' principals. (See *Pl.'s Ex. 10*; Dusyn Decl., *Def.'s Ex. 20, ¶ 5*). Accordingly, the so-called "offer" then on the table was one in which FLT would pay $150,000 to be payable over five years. (Dusyn Decl., *Def.'s Ex. 20, ¶ 16*; cf. LSI's Memo., p. 23). This "offer" is not the same as the agreement LSI now seeks to enforce. Despite the differences, LSI maintains that this offer was "definite and certain", and therefore constituted a valid offer. (See LSI's Memo., p. 23).

It is clear that LSI never accepted FLT's offer. (See LSI's Memo., pp. 25). LSI's purported "acceptance" was not directed to the same terms and conditions as in FLT's offer, nor did the purported agreement, in LSI's mind, conform to the proposed settlement terms in FLT's mind. Lastly, the purported agreement failed to address several terms and conditions that had been part of the negotiations prior to the September 5, 2003 letter, and thus, the so-called offer did not completely address all of the material issues that should have formed a formal and complete settlement between the parties.

1.    LSI's "Acceptance" Was Actually a Counter-Offer because LSI Altered the Terms of FLT's So-Called "Offer"

According to LSI, FLT made an offer on September 5, 2003 which LSI then accepted. (See LSI's Memo., p. 23). However, LSI can cite no evidence that FLT's offer had the same terms as LSI's acceptance. In reality, FLT's so-called offer was consistent with the earlier preliminary oral agreement reached by Messrs. Ell and Sauska on May 1, 2003. (See Dusyn

Decl., *Def.'s Ex. 20, ¶ 5*).  After the parties could not agree on a settlement of $200,000 for a paid-up license on the '101 patent and the Solymar patent, FLT simply returned to the previously discussed $150,000 amount.  (See *Pl.'s Ex. 10*).  FLT's express referral to the earlier preliminary agreement implied that any settlement amount would be payable over a five-year period.  (See Dusyn Decl., *Def.'s Ex. 20, ¶ 16*).

LSI's purported acceptance altered the payment plan in the preliminary agreement to a one-time payment.  (See *Pl.'s Ex. 11* ("Obviously, the payment of the $150,000.00 would be a one-time payment and would be non-refundable."); see also *Pl.'s Ex. 13* (acknowledging that the payment plan had not been agreed to)).  FLT never agreed to a one-time payment and LSI has never agreed to a five-year payment plan.  This is clear from Magistrate Judge Garfinkel's statement on October 9, 2003 that "[o]ne thing is clear – there isn't an enforceable deal yet because important payment logistics have been up in the air."  (*Def.'s Ex. 28*; see also *Pl.'s Exs. 12, 12A*; Dusyn Decl., *Def.'s Ex. 20, ¶ 17*).

Therefore, LSI's so-called acceptance is actually a counter-offer that was never accepted by FLT.  In fact, the parties continued to dispute the payment terms of any settlement amount well after LSI's so-called acceptance.  See Orr Constr., 560 F.2d at 770 ("[T]he record shows that the parties consistently clashed over the meaning of [a clause in their tentative agreement] during the course of their negotiations following the exchange of proposals, indicating that they never had reached a true agreement."); cf. Enterprise Rent-A-Car Co. v. Rent-A-Wreck of Am., Inc., 181 F.3d 906, 908 (8th Cir. 1999) (oral acceptance of an offer with no alterations constituted enforceable agreement).  Clearly the continued disputes between the parties on terms in LSI's so-called agreement indicates that the parties never had a true agreement.  See Millgard, 224 F. Supp. 2d at 433 ("a court only has the authority to summarily enforce a settlement

agreement 'when the terms of the agreement are clear and unambiguous.'" (citations omitted)). This is further confirmed by FLT's October 2, 2003 letter, detailing the disputed issues that remained between the parties.  (See *Pl.'s Ex. 14*).

      2.      <u>LSI's Purported Agreement Was Not the Result of a "Meeting of the Minds"<br>between the Parties</u>

Negotiation is an efficient process by which two entities can arrive at a <u>mutual</u> understanding that can then be memorialized in a written agreement.  The exchange of ideas, concepts, concerns and conditions to promote mutuality of agreement is a natural part of the negotiation process.  If one party attempts to preempt that exchange by imposing an acceptance of something that was never intended by the other party, then this process is frustrated and compromised.

A district court does not have the power to impose a settlement agreement when there was never a meeting of the minds.  <u>See</u> <u>Wang Labs.</u>, 958 F.2d at 359 (The Court "does not have the power to make an agreement for the parties or to decide, contrary to the facts and the law, that a draft settlement agreement was binding when the parties did not agree on it.").  In this case, LSI is attempting to impose an agreement on FLT that FLT never intended to be a party to. In short, based on the presentation of facts herein, it is clear that there has never been a <u>complete</u> meeting of the minds between LSI and FLT that can form the basis of an enforceable agreement. <u>See</u> <u>id.</u>; <u>Ozyagcilar</u>, 701 F.2d at 308.

In determining whether a "meeting of the minds" occurred, the objective, rather than subjective, intent of the parties controls.  <u>See</u> <u>United Paperworkers Int'l Union v. Champion Int'l Corp.</u>, 908 F.2d 1252, 1258 (5th Cir. 1990).  In <u>Wang Labs.</u>, the court held that a verbal draft settlement agreement was not a binding agreement because the parties "never in fact reached agreement on the terms of conditions of a settlement."  <u>Wang Labs.</u>, 958 F.2d at 359.  Here, a

review of the entire chronology of facts makes it clear that the parties are in obvious disagreement over a number of issues which need to be further negotiated if an enforceable agreement is to be brought to fruition.  See Local Motion, Inc. v. Niescher, 105 F.3d 1278, 1280 (9th Cir. 1997) ("The presence of an ambiguous material term may indicate that no meeting of the minds occurred . . . ."); see also Millgard, 224 F. Supp. 2d at 433 ("a court only has the authority to summarily enforce a settlement agreement 'when the terms of the agreement are clear and unambiguous.'" (citations omitted)).

For example, the exchanged correspondence and Draft Settlement Proposals demonstrate that the parties never arrived at a mutual acceptance of all of the terms and conditions being discussed.  In fact, it is clear that the parties do not agree on several terms of the alleged agreement.  Since at least June 2003, FLT expressed its concerns about resolving potential future disputes between the parties and indicated its desire to negotiate a settlement that addressed these concerns.  (See, e.g., *Pl.'s Ex. 8*).  Additionally, ever since the personal negotiations between Messrs. Ell and Sauska took place, FLT has maintained that it would prefer a settlement amount to be paid over a period of time, preferably over five years.  LSI also notes that it implied that the term of the agreement would only last through the term of the '101 patent.  (See LSI's Memo., p. 23).  However, the documented facts show that FLT did not share LSI's view over the term of the agreement.  (See, e.g., *Pl.'s Ex. 14A*).  The purported settlement LSI is seeking to enforce does not address any of these issues.

If such a "meeting of the minds" had occurred, the difference between the parties' respective positions would not be so far apart.  (Cf. *Pl.'s Ex. 12A* with *Pl.'s Ex. 13A*).  Moreover, the fact that Atty. Fattibene and Mr. Sauska have been unable to recall conversations, of which they were a part, is highly probative that the parties did not have a "meeting of the minds".  It is

further notable that LSI requested a Settlement Conference to put any agreement reached "on the record". If an agreement had already existed, as LSI now claims, why would LSI need a Settlement Conference to put an agreement on the record? LSI's past actions are inconsistent with its current assertions. The facts reveal that even LSI did not consider there to be any enforceable agreement.

The cases cited by LSI generally recognizing enforceable oral agreements involved agreements reached in chambers or in open court that were placed on the record. See, e.g., Core-Vent Corp. v. Implant Innovations, Inc., 53 F.3d 1252, 1256-57 (Fed. Cir. 1995) (parties entered into binding settlement agreement when agreement was announced in open court and settlement terms were entered into the record); S & T Mfg. Co. v. County of Hillsborough, 815 F.2d 676, 677 (Fed. Cir. 1987) (transcript from settlement proceeding before trial judge setting forth agreement was signed by the parties and their counsel); but see Callie v. Near, 829 F.2d 888, 890 (9th Cir. 1987) (no enforceable agreement even where one party's wrote to opposing counsel to "confirm" and describe the terms of an alleged settlement and the opposing counsel refused to execute a proposed stipulation on those terms). Here, by contrast, LSI can only identify an agreement by implying some terms of the agreement in its favor, while ignoring other terms then in negotiation that were not in its favor. No formal or written record of any complete settlement terms was ever created. It is precisely for this set of facts and circumstances that case precedent requires a "meeting of the minds" on all material issues in order to arrive at an enforceable settlement agreement. See Ozyagcilar, 701 F.2d at 308 ("[T]he district court only retains the power to enforce complete settlement agreements; it does not have the power to impose, in the role of final arbiter, a settlement agreement where there was never a meeting of the parties' minds." (emphasis in original)).

3.  <u>Several Issues on the Table Prior to FLT's So-Called "Offer" Were Ignored by LSI's Alleged "Acceptance", and, Therefore, No Enforceable Agreement Was Reached on All of the Material Issues for Settlement</u>

As noted above, LSI's "acceptance" of FLT's offer, as expressed in LSI's September 12, 2003 letter (*Pl.'s Ex. 11*), was accompanied by an altered proposed payment plan that had never been previously negotiated, thereby making LSI's "acceptance" a counter-offer.  (See also *Pl.'s Ex. 13* (acknowledging that the payment plan had not been agreed to)).  LSI also implied from FLT's so-called offer that the term of the agreement would be limited to the remaining term of the '101 patent.  These, and other issues, were still open for negotiation inasmuch as neither the so-called "offer" nor the actual counter-offer addressed these and other issues in such definite and certain terms as to create an enforceable agreement.

It is clear that there were more issues involved in the settlement negotiations between the parties than just the amount of monies to be paid by FLT.  Specifically, FLT has consistently made it clear to LSI, both orally and in writing, that it was desirous of reasonable language regarding potential future disputes between the parties.  (See, e.g., *Pl.'s Exs. 8, 10, 12, 12A, 14, 14A & 16*; Dusyn Decl., *Def.'s Ex. 20, ¶ 14*).  LSI has chosen to ignore these discussions and instead has opted to focus only on the monetary issue.  (See LSI's Memo., p. 22).  However, LSI's ignorance of all the facts, and the issues raised thereby, is not sufficient to force FLT into an involuntary contract to which only LSI has apparently agreed.  <u>See</u> <u>Wang Labs.</u>, 958 F.2d at 359.

As noted, an enforceable settlement is the product of an offer, an acceptance of that offer, and a meeting of the minds between the contracting parties on all the material issues for the contract.  There are two requisites to a valid offer.  First, the offer must be made with the intention of creating a legal relationship.  Second, the offer must be definite and certain.  <u>See, e.g.</u>, <u>L & R Realty</u>, 53 Conn. App. at 534-35.  Though oral settlement agreements may be

enforced, "it is common to complete such settlement agreements in writing, particularly under the circumstances of this case, where the parties have a complicated relationship and where substantial financial interests are involved." Millgard, 224 F. Supp. 2d at 433.

The purported offer made by FLT that was accepted by LSI is not clear from LSI's presentation of facts. LSI states that FLT made a blanket offer of $150,000 with no other conditions attached. LSI also "implied" that payment of $150,000 would effect a dismissal of the lawsuit though this was not discussed in the letter. (See LSI's Memo., p. 23). In effect, LSI asserts that FLT suddenly shifted from all of its prior positions regarding a payment plan for any settlement amount, the length of the agreement, and language resolving future disputes.

In Millgard, the parties had reached an oral agreement for settlement, and, in fact, had notified the court that a settlement had been reached. See Millgard, 224 F. Supp. 2d at 432. However, the parties could not agree on the final proposed settlement. A Motion to Enforce the settlement was denied because the movant could not show that all of the parties mutually agreed to all of the essential terms and conditions of the settlement. See id. (parties could not resolve the significant issue surrounding a $250,000 credit should a party's security interest be subordinated). Accordingly, the court ruled that no settlement existed because "at least one of the important terms of the agreement was neither clear and unambiguous, nor agreed to." Id.

FLT's September 5, 2003 letter expressly states that if LSI was unwilling to go through with a fully paid-up license on the '101 patent and the Solymar patent, then the settlement discussions would return to the previous preliminary oral agreement between the parties' principals. (See *Pl.'s Ex. 10*; Dusyn Decl., *Def.'s Ex. 20, ¶¶ 14-16*). Accordingly, the so-called "offer" then on the table was one in which FLT would pay $150,000 to be payable over five years. (Dusyn Decl., *Def.'s Ex. 20, ¶ 16*; cf. LSI's Memo., p. 23).

LSI's current position about the payment period is also disingenuous given that LSI itself had earlier discussed the $200,000 offered amount as involving payment over a period of four years. (See *Pl.'s Ex. 9*). Therefore, for LSI to assume that FLT's so-called September 5, 2003 offer went from at least a four-year payment plan to a one-time payment cannot be supported by any factual evidence. See also Orr Constr., 560 F.2d at 770 (clashes over terms in negotiations after proposals exchanged indicated lack of true agreement). Instead, LSI attempts to ignore these disputes by dismissing the issue as not being a "core" issue.[3] Realistically, it is clear that FLT returned to a payment period of five years, and this offer was never accepted by LSI. (See *Def.'s Ex. 28* (Magistrate Judge Garfinkel's observation that "[o]ne thing is clear – there isn't an enforceable deal yet because important payment logistics have been up in the air."); see also *Pl.'s Ex. 13* (acknowledging that the payment plan had not been agreed to)).

During the negotiations, the parties, or at least FLT, also discussed resolving future disputes. (See *Pl.'s Exs. 8, 9*). LSI has expressly refused to extend a license to cover the Solymar patent. However, this did not mean that FLT's concerns were off the table and any less important. The correspondence between the parties makes it clear that, at least in the mind of FLT, the resolution of potential future disputes remains a critical issue for any reasonable settlement. (See, e.g., *Pl.'s Ex. 8, p. 2* ("All differences and conflicts that may exist between LSI and FLT regarding their intellectual property interests, whether past, present or future, will be resolved.")). Despite its involvement in these discussions, LSI conveniently chooses to ignore these communications between the parties in support of its purported agreement.

---

[3] In fact, LSI actually requests the Court to define terms and conditions of the purported agreement. (See LSI's Memo., pp. 26-27 ("[T]he Court could construe the settlement reached as a matter of law to provide that the payment be made within a reasonable time period."); but see In re Air Crash Disaster, 687 F.2d at 629 (beyond the court's discretion to alter the terms of an agreement absent special circumstances)).

Further, up to the time of LSI's alleged "acceptance", the parties had never discussed the length of the settlement between the parties. LSI apparently only intended any mutually agreed settlement to cover the remaining life of the '101 patent.[4] (See LSI's Memo., p. 24). This position was never made clear to FLT. As noted, FLT has stated that it was concerned with potential future disputes between the parties and therefore was not interested in limiting the agreement term just to the life of the '101 patent. (See, e.g., *Pl.'s Exs. 14, 14A*).

Any license under the '101 patent would necessarily be limited to the term of the patent. However, this does not mean that any agreement between the parties must be limited to the same time period. (Cf. LSI's Memo., p. 25, n.3 (erroneously arguing that even FLT's payment could not extend beyond the term of the '101 patent); but see *Pl.'s Ex. 9* (agreeing to payment over four years)). It would make no sense to account for disputes between the parties for only a relatively short period of time. Consequently, FLT's negotiating position regarding the length of the settlement was not the same as LSI's when the so-called agreement was reached. (See also *Pl.'s Ex. 14, p. 5*).

LSI states that its acceptance was "absolute and unconditional and was made strictly in accordance with the terms of the offer." (LSI's Memo., p. 24). Inasmuch as the complete terms of the so-called offer were never negotiated, and in fact, since LSI materially changed several aspects of the proposed offer itself, it is clear that no agreement was reached between the parties on all relevant issues. See L & R Realty, 53 Conn. App. at 534-35 ("To form a valid and binding contract in Connecticut, there must be a mutual understanding of the terms that are definite and certain between the parties. . . . If the minds of the parties have not truly met, no enforceable contract exists.").

---

[4] The '101 patent expires on February 7, 2005. See 35 U.S.C. § 154(a)(2).

4.     FLT's Proposed ADR Provision Was Only "New" after LSI Refused to Provide a License under the Solymar Patent; The Reasons for the ADR Provision Existed Well Prior to FLT's So-Called "Offer"

It is correct that FLT only first formally proposed an ADR provision in its Draft Proposal dated September 26, 2003.  (See *Pl.'s Ex. 12A, ¶ 6*).  However, it is clear that, in general, this was not a "new" issue, as argued by LSI.  LSI characterizes a "new issue" as an issue that was never discussed between the parties prior to September 12, 2003 (LSI's so-called date of acceptance).  Using this characterization as a guide, it is clear that several aspects included in LSI's so-called agreement are actually "new" issues, while LSI has incorrectly excluded several issues that were on the table prior to September 12, 2003, such as resolution of future disputes between the parties.

FLT expressed its concerns about potential future disputes on several occasions prior to presenting its Draft Proposal.  (See Dusyn Decl., *Def.'s Ex. 20, ¶ 14*; *Pl.'s Exs. 8, 9*; see also FLT's Facts ¶¶ 25-28, <u>supra</u>).  These concerns were also made clear to LSI prior to September 12, 2003.  For example, FLT's first attempt at formally addressing these concerns was its proposal whereby FLT would pay LSI $200,000 in exchange for a paid-up license on both the '101 patent and the Solymar patent.  (See Dusyn Decl., *Def.'s Ex. 20, ¶ 14*; *Pl.'s Ex. 8*).  LSI refused to grant a paid-up license on the Solymar patent.  (See also *Pl.'s Ex. 9*).  FLT then proposed the disputed ADR provision as a means for resolving potential future disputes.  (See *Pl.'s Exs. 12, 12A*).  Had LSI agreed to the fully paid-up license on the Solymar patent and the '101 patent for $200,000, no such ADR provision would be necessary.  It was only after LSI refused FLT's offer that an ADR provision was deemed necessary.  Thereafter, the ADR provision was proposed to advance the negotiation process.  In fact, FLT's letter of September 26, 2003 clearly states that the Draft

Agreement was intended as a means to expedite negotiations prior to the October 8, 2003

Settlement Conference scheduled with Magistrate Garfinkel:

> In order to initiate the settlement agreement process and ferret out any outstanding issues that may exist between the parties, FLT suggests and proposes the terms and conditions contained in the enclosed Settlement Agreement draft. Please keep in mind that this draft is intended as a template, and if you have any other issues that you would like addressed in the Agreement, please propose them now so that we can consider them before we meet with Magistrate Judge Garfinkel.

(*Pl.'s Ex. 12*).

Though LSI may refuse to recall these earlier instances in order to support the present

Motion, FLT's position in all negotiations since at least June 2003 were contingent upon

negotiation of a settlement that would address all of FLT's concerns.

Interestingly, LSI has no problem with several "new" issues it has since incorporated into

its purported agreement to make it appear complete and enforceable. (See LSI's Memo., p. 26).

Specifically, FLT's September 26, 2003 Draft Proposal presented issues that were never

discussed between the parties prior to September 26, 2003. (See *Pl.'s Ex. 12A*). These issues

included the recognition of the ownership of the '101 Patent (¶ 1); the grant of a fully paid-up

license (¶ 2); release of past claims that each party may have against the other (¶ 3); withdrawal

of the lawsuit (¶ 4); assigned costs for attorneys fees (¶ 5); the term of the Settlement Agreement

(¶ 7); and the jurisdictional laws controlling a finalized and yet-to-be-reached settlement

agreement (¶ 10). LSI's illogic seems to imply that any terms and conditions of FLT's

September 26, 2003 Draft that LSI agrees with, even though "new" by LSI's own standard, may

be made retroactive to September 12, 2003, while terms and conditions with which LSI disagrees

establishes that FLT has been acting with "bad faith".

In neglecting FLT's proposed ADR provision, LSI's sole rationale is that the provision

constituted a "new" issue. If this rationale is extended through to its logical conclusion, then

why aren't the remaining paragraphs of FLT's September 26, 2003 Draft Proposal considered to be "new" issues? If this rationale is accepted, then these "new" issues should not be a part of the purported "agreement" reached between LSI and FLT on September 12, 2003. If all of these "new" issues are removed, it becomes obvious that LSI's purported agreement is an agreement on monetary amount, and nothing more. LSI's inconsistent reasoning is absurd and is part of what constitutes the frivolous nature of LSI's Motion.

C.    *LSI's Failure to Address Any of FLT's Negotiating Points, Combined with LSI's Misplaced Reliance on a Settlement Agreement to Which FLT Has Not Agreed, Indicate that LSI Has Not Negotiated in Good Faith*

LSI's conduct throughout the settlement discussions in this case makes it clear that LSI has had no intent of actually negotiating with FLT in good faith. Instead, LSI selectively recalls only those discussions favorable to its own positions in order to lock FLT into an agreement with terms to which FLT has not consented. LSI identifies only those issues it unilaterally believes are relevant and has ignored all other issues as "new" issues. By characterizing issues as "new", LSI has taken the position that it need not make an effort to address issues embodying FLT's legitimate concerns, even when the Magistrate Judge requested the parties to continue to negotiate the settlement terms, including those so-called "new" issues raised by FLT. (See *Def.'s Ex. 28*).

LSI has refused to negotiate with FLT because LSI believed a settlement was in place. However, as presented herein, it is now clear that the terms making up LSI's purported agreement were never offered by FLT in such definite and certain terms to form a valid offer at the time when LSI asserts the offer was made. Moreover, the specific terms of FLT's so-called "offer" were altered by LSI's acceptance. Additionally, most of the terms in LSI's agreement were not included in the so-called "offer". Similarly, other terms that FLT intended to discuss

were never addressed in LSI's so-called "acceptance". Thus, while FLT has attempted to resolve issues in dispute, LSI has maintained a hard-lined stance on an alleged agreement that cannot be enforced. To rule otherwise is tantamount to working an unfair advantage and prejudice to FLT.

IV.    OTHER BOGUS ISSUES RAISED IN LSI'S MEMORANDUM

A.    *The Fact that No ADR Provision Was Requested in **This** Case Is Irrelevant*

LSI correctly notes that the parties have not requested ADR in the Joint Planning Report. (See LSI's Memo., pp. 18-19, 29-30). FLT fails to see the relevance of this fact in LSI's Motion. As has been made abundantly clear, FLT is desirous of language in any settlement that addresses potential **future disputes** between the parties. Merely because FLT has not requested ADR in this case does not mean that it cannot request ADR in a future dispute. LSI's assertions of "bad faith" on the part of FLT is merely a rouse to turn the attention away from LSI's own refusal to negotiate a mutually agreeable settlement in good faith.

If anything, the present case reveals and justifies why FLT would be desirous of an ADR provision. This is the second time LSI has sued FLT for patent infringement. Both times, FLT has questioned the merit of the lawsuit and has formed a belief that the litigation is a means of harassing FLT, both in court and in the marketplace. Though LSI likely denies it now, Mr. Sauska has already indicated an intent to sue FLT in the future, even though the suit would be based on a lamp design yet to be introduced into the marketplace. Moreover, the parties throughout this case have been unable to resolve many of their disputes – e.g., discovery issues, scheduling issues, etc. (See Magistrate's Memo., *Def.'s Ex. 28* ("[T]he ADR provision seems like a very good idea, especially because of these parties' history.")). Therefore, FLT feels justified in seeking some appropriate language in any settlement addressing future disputes between the parties.

B.    *LSI's Discussion of the Solymar Patent Litigation Is Misleading*

LSI apparently believes that FLT's seeking an ADR provision, or some other language addressing potential future disputes, is an attempt to renegotiate the prior agreement between the parties regarding the Solymar patent.  (See LSI's Memo., pp. 28-29).  This belief is misplaced. FLT has made it clear that it is not trying to rewrite the October 2000 Agreement.  (See, e.g., *Def.'s Ex. 30*; *Pl.'s Ex. 8*; FLT's Facts, ¶¶ 26-28, supra).  Accordingly, LSI's assertions that FLT intends to willfully violate the prior Agreement have no basis in fact.  (See LSI's Memo., p. 18).

The October 2000 Agreement came about after FLT provided LSI with evidence indicating that the Solymar patent was invalid.  Accordingly, the prior settlement was reached such that no monies were paid by FLT in exchange for LSI withdrawing its suit.  (See *Pl.'s Ex. 18*).  FLT further agreed that it would not make, use, sell or distribute "four-pin stepped lamps which employ the construction illustrated in Figures 1-4 of the Solymar Patent **and** claimed in the Solymar Patent for the term of the Solymar Patent."  (Pl.'s *Ex. 18, ¶ 2* (emphasis added); cf. LSI's Memo., p. 17).  However, the prior settlement placed no restriction on LSI from suing FLT in the future for lamp designs not illustrated <u>and</u> claimed by the Solymar Patent.  Though any such suit would be ill-advised based on the extremely probative evidence questioning the Solymar patent's invalidity, Mr. Sauska has already indicated an intention to sue FLT if it sells lamps not covered by the October 2000 Agreement.  This apparent threat has, in a way, justified FLT's concerns regarding potential future disputes between the parties.

C.    *Any Payment by FLT to LSI Would Constitute a Hardship, Regardless of Amount*

FLT does not budget for litigation and settlements.  Accordingly, any amount of monies that FLT would have to pay to a competitor would constitute a hardship in the market.  LSI asserts that FLT's insistence on a payment plan during negotiations is an indication of "bad

faith" negotiating.  (See LSI's Memo., p. 27).  Merely because a party can pay a settlement amount in one payment does not automatically mean the party must make a one-time payment. Payments over a period of time are common in settlements.  (See Magistrate's Memo., *Def.'s Ex. 28* ("[I]t is not unusual these days to have settlement amounts paid over time.")).  Therefore, the payment plan for settlement of this case is a legitimate and material issue.  The fact that LSI has refused to negotiate this issue further proves that no enforceable settlement existed between the parties.

D.      *The Alternative Settlement Offers Proposed by FLT Were Made in Accordance with the Magistrate's Suggestion*

In the Magistrate's Memorandum dated October 9, 2003, the parties were encouraged to continue efforts to resolve the outstanding settlement disputes.  Pursuant to this instruction, FLT offered three alternative settlement proposals.  By this time, it was clear that LSI was not agreeable to an ADR provision.  FLT attempted to propose compromises.  For LSI to now assert that FLT's proposing alternative settlement offers, in accordance with the Magistrate's instructions, is evidence of "bad faith" is itself disingenuous and proves that LSI, itself, has not been making good faith efforts to even reasonably negotiate with FLT.

V.      CONCLUSION

For at least the foregoing reasons, and taking into considerations the totality of the facts surrounding settlement negotiations between the parties, FLT submits that the Court deny LSI's Motion.  Further, due to the clear lack of merit of LSI's Motion, FLT respectfully requests the Court to award FLT its costs and reasonable attorneys' fees incurred in responding to LSI's frivolous Motion.

Respectfully submitted by,

Defendant,
First Light Technologies, Inc.,

Dated:  November 20, 2003             By:  /s/ Wm. Tucker Griffith
                                          John C. Linderman (ct 04291)
                                          Wm. Tucker Griffith (ct 19984)
                                          McCormick, Paulding & Huber LLP
                                          CityPlace II, 185 Asylum Street
                                          Hartford, CT 06103-4102
                                          tucker@ip-lawyers.com
                                          Tel.: 860-549-5290
                                          Fax: 860-527-0464

                                          Kenneth F. Dusyn (ct 21859)
                                          330 Main Street, 3rd Floor
                                          Hartford, CT 06106
                                          kdusyn@aol.com
                                          Tel.: 860-246-4600
                                          Fax: 860-722-9570

                                          Attorneys for Defendant

**<u>Certificate of Service</u>**

I hereby certify that on the __ day of November 2003, a true copy of the foregoing

FIRST LIGHT TECHNOLOGIES' OPPOSITION TO LIGHT SOURCES' MOTION TO

ENFORCE SETTLEMENT AGREEMENT was served by first class, U.S. Mail on the following

counsel of record for Plaintiff:

> Arthur T. Fattibene
> Paul A. Fattibene
> Fattibene and Fattibene
> 2480 Post Road
> Southport, CT 06490

By  /s/  Wm. Tucker Griffith
         Wm. Tucker Griffith